UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re BRIGANTINE DEVELOPMENT, L.L.C.,

     Debtor.

_____/

Case No. 05-73771
Bankr. Case No. 03-42046

HON. AVERN COHN

## MEMORANDUM AND ORDER

### I. Introduction

This is a bankruptcy appeal arising out of an adversary proceeding in the estate of Brigantine Development, LLC (Brigantine) following a remand to the Bankruptcy Court.[1]  Defendant-Appellant Robert Pasek (Pasek) initially appealed from an order of the Bankruptcy Court finding him personally liable for $617,257.89 based on a violation of the Michigan Builder's Trust Fund Act, M.C.L. § 570.151 (MBTFA).  Pasek also appealed the Bankruptcy Court's order striking certain exhibits attached to Pasek's trial brief.  The Court affirmed in part, reversed in part, and remanded the case to the Bankruptcy Court for further proceedings, specifically "to determine whether Pasek is entitled to credit for labor payments during the relevant time, based on the record including the exhibits attached to his original trial brief."  See Memorandum and Order

_____

[1]This is the third appeal from the Bankruptcy Court in this case.  The first appeal concerned the Bankruptcy Court's order granting Brigantine's motion to invalidate a construction lien filed by R&D Contracting on the grounds that the lien was not filed within 90 days after R&D last worked for Brigantine.  The Court affirmed the Bankruptcy Court.  As will be discussed, the second appeal concerned the Bankruptcy's Court's finding of liability under the Michigan Builder's Trust Fund Act which the Court affirmed in part, reversed in part, and remanded for further proceedings.

filed May 10, 2005 at p. 12 (emphasis added).

On remand, the Bankruptcy Court made a detailed review of the record and determined that Pasek had accounted for an additional $85,983.24 in labor payments and therefore reduced and amended the judgment against him to $531,274.65.

Pasek again appeals, contending that the Bankruptcy Court erred in its determination. For the reasons that follow, the decision of the Bankruptcy Court is AFFIRMED.

II.  Background

A.

Brigantine developed a waterfront residential real estate project of approximately forty three acres along the Clinton River in Harrison Township known as Brigantine Estates. In November 2001, Brigantine entered a contract with R&D Contracting and LLC/Midstates Contracting, Inc. to perform underground utilities and road paving work on the project. The contract was signed by Pasek for R&D; there was no signatory for Midstates Contracting, Inc. Pasek and Piccirilli were officers of R&D, GRS Corp. and Midstates Contracting, Inc.

On January 23, 2002, Brigantine filed a petition under Chapter 11. At the time of filing, Brigantine had several construction lien creditors who filed suit against it in the Macomb County Circuit Court. On April 28, 2002, Brigantine's plan of reorganization was confirmed. The plan provided for, inter alia, the sale of lots in Brigantine Estates.

Meanwhile, on February 13, 2002, R&D filed for bankruptcy. On May 30, 2002, R&D filed its business plan, stating it intended to terminate operations as of May 2002.

On June 11, 2002, Brigantine filed an adversary complaint against Midstates

2

Contracting, Inc., GRS Corporation, Pasek, and Nicholas Piccirilli asserting various claims regarding work performed on the project.  Specifically, count I claimed breach of contract against Mid-States for performing work in a defective manner, failing to perform work in conformance with the contract, failing to complete the work within the time required under the contract, failing to promptly pay all laborers, suppliers, and materialman, and failing to supply the necessary labor, material, and equipment.  Count II claimed a violation of the MBTFA, alleging that Mid-States, Pasek, and Piccirilli were trustees of the funds disbursed by Brigantine in connection with work on the project and that defendants violated the act by using funds without first paying laborers, subcontractors, and/or materialmen who provided labor or services on the project.  Count III asked for an accounting of all the building contract funds.  Count IV claimed a fraudulent conveyance, alleging that defendants transferred building contract funds to themselves and/or others with the intent to defraud Brigantine.  Count V claimed a civil conspiracy to misappropriate funds paid by Brigantine on the project.  Count VI sought injunctive relief preventing the transfer of funds.  Count VII claimed negligence against Mid-States and Piccirilli regarding the work performed on the project.

B.

The parties waived their right to a trial on the adversary complaint and instead agreed to rely on their trial briefs and joint exhibits.  On June 30, 2004, Brigantine and defendants filed trial briefs.  Attached to defendants' trial brief were four exhibits which were not part of the joint exhibits.  Almost two months later, on August 19, 2004, Brigantine filed a motion to strike the defendants' trial exhibits and/or leave to file a reply brief on the grounds that they were not included the in joint exhibits and were not

3

disclosed to Brigantine during discovery.  Defendants filed a response.  A hearing was held on September 20, 2004 at which the Bankruptcy Court granted the motion to strike.

Five weeks later, on October 27, 2004, the Bankruptcy Court entered an Opinion dismissing defendants Piccirilli, GRS Corp. and Mid-States and all of Brigantine's claims against all defendants except a claim against Pasek for a violation of the MBTFA.  The Bankruptcy Court found that Pasek had violated the MBTFA and entered a judgment against him in the amount of $617,257.89.

Pasek appealed both rulings of the Bankruptcy Court.  Pasek, however, did not challenge the Bankruptcy Court's decision finding him personally liable under the MBTFA; he challenged only the Bankruptcy Court's finding as to the amount of his liability.

On appeal, the Court affirmed the Bankruptcy Court's determinations on all issues except for its finding regarding labor payments because the Bankruptcy Court did not consider Pasek's exhibits.  The Court remanded the case to the Bankruptcy Court with instructions to consider the exhibits along with the record to determine if Pasek was entitled to "credit for labor payments during the relevant time."

On remand, the parties filed detailed papers regarding Pasek's labor payments. The Bankruptcy Court considered all of the evidence and found that Pasek had accounted for $85,983.24 in labor payments and amended the judgment accordingly. Pasek appeals.  The main issue on appeal concerns the scope of "the relevant time." That is, what is the period of time in which the record may be examined to determine whether Pasek is entitled to any credits on the judgment against him as a result of having made payments for labor expenses.

4

III.  Analysis

A.

This Court reviews factual findings made by a bankruptcy judge for clear error. In re Baker & Getty Fin. Servs., 106 F.3d 1255, 1259 (6th Cir. 1997).  Conclusions of law are reviewed de novo.  In re Zaptocky, 250 F.3d 1020, 1023 (6th Cir. 2001).  See also In re Lopez, 292 B.R. 570, 573 (E.D. Mich. 2003).

B.

1.

Pasek says that the Bankruptcy Court erred because it failed to consider payments made prior to October 4, 2001 - the date when the Trust Funds came into existence and payments made after November 30, 2001 - the date the Bankruptcy Court found all of the Trust Funds had been disbursed.

Brigantine says that the issue on remand was not the time period for tracing the monies, but rather whether Pasek's additional exhibits showed that he was entitled to additional credit for expenditures made during the relevant time period - October to November 2001.  The Court did not disturb the Bankruptcy Court's finding as to this time period.  Thus, Brigantine says there is a real question of whether Pasek is entitled to raise the issue of the proper time period in this appeal.

2.

Assuming that the issue is properly before the Court, it is helpful to recite the following background facts taken from the Court's May 10, 2005 Memorandum and Order:

> R&D began work on the Brigantine project on September 4, 2001.
> Brigantine issued two checks to R&D totaling $698,919.50 for its work on the

5

project, as follows:

| Check 1355 | issued Sept. 28, 2001 | $198,892 |
| Check 1372 | issued Nov. 5, 2001 | $498,027.50 |

The $198,892 check was deposited into GRS's bank account on October 2, 2001.  These funds were all disbursed by the end of October 2001.  The $498,027.50 check was deposited into GRS's bank account on November 2, 2001.  These funds were all disbursed by November 30, 2001.

It is undisputed that the $698,919.50 was impressed with a trust under the MBTFA.  The question before the Bankruptcy Court was how much, if any, of this amount was disbursed in violation of the MBTFA, i.e. for expenses other than to pay laborers, subcontractors, and materialmen during the relevant time from October to the end of November 2001.  The Bankruptcy Court found that $617,257.89 was disbursed in violation of the MBTFA.

Also important to an understanding is an examination of the payment terms of

the contract between R&D and Brigantine.  Article 4 of the contract provides:

a.      The Owner [Brigantine] shall make payments on account of the Contract Sum[2] as follows:

(i) The Contractor [R&D] shall submit to the Owner's Agent an itemized progress statement, no less than thirty (30) days, showing the quantity of installed materials to date from the previous invoice and the amoount due therefor based upon the Unit Prices for such materials as set forth on Exhibit C hereto.  The Owner's Agent shall thereupon check such statement and if found correct, then upon Owner's lender's approval, the Owner shall pay the Contractor ninety (90%) percent of the amount thereof, less the aggregate of previous payments, within 21 calendar days from which the progress statement is received.

...

b.      As a condition precedent to all payments hereunder, the Contractor shall submit an itemized invoice and sworn statement for the preceding period together with invoices from the material suppliers and sub-contractors who have theretofor performed Work or provided materials for the Contractor under this Contract setting forth the amounts due for each payment period to such sub-contractors and suppliers, together with such information as

---

[2]The Contract Sum is listed under Schedule C and totals $1,431,276.50.

6

> Owner's lender shall required to make payment directly to the sub-
> contractors and for material suppliers.

Thus, R&D would invoice Brigantine and Brigantine would pay the invoice amount, less 10%. Here, R&D presumably submitted two invoices[3] to Brigantine who then paid on them.

### 3.

The Bankruptcy Court determined that only payments after October 2, 2001 could be used to trace the trust funds because the $198,982.00 was not deposited in the account until October 2, 2001. Pasek claimed that another check in the amount of $15,000.00 which issued on October 1, 2001 was used to make labor payments. However, the Bankruptcy Court did not consider this payment because it was made prior to the October 2, 2001 deposit. The Bankruptcy Court specifically found that

> Pasek cannot be given credit for any labor expenses paid prior to October
> 4, 2001, because that is the date of the first check the Court can consider from
> the GRS account to the R&D account.

The Court agrees. The trust, for purposes of the MBTFA, was not created until October 2, 2001 when the first monies were deposited into GRS's account. This is undisputed. That Pasek may have made payments prior to this time with monies from other sources simply has no bearing on tracing the payments held in trust. Any perceived unfairness in not crediting Pasek for payments made to laborers prior to the creation of the trust is not the fault of the Bankruptcy Court, but rather the result of the application of the MBTFA. The trust arises after Brigantine made its first payment, not before. The Act does not provide that any "credit" may be given for non-trust monies used for labor

---

[3]The invoices are not a part of the record.

7

expenses prior to receipt of a payment which is impressed with the trust.

As to payments made <u>after</u> November 2001, the Bankruptcy Court previously determined that all funds had been disbursed as of the end of November - this issue was not considered on remand.  Rather, the Bankruptcy Court considered all of the checks issued from October to November 2001 and compared them with the time records to determine what amounts, if any, were spent on labor.  This was no easy task. Pasek presents no good argument as to why he should be given credit for monies spent after November 2001 much less show that the monies held in trust were not disbursed by that time.

Overall, the issue before the Bankruptcy Court on remand was to determine what amounts if any, Pasek spent on labor expenses during the "relevant time" which the Bankruptcy Court had already determined that time to be October and November 2001. This meant considering Pasek's exhibits attached to his trial brief.  Pasek does not argue that the Bankruptcy Court failed to consider these exhibits, but instead argues that the "relevant time" for considering payments has now expanded.  Even assuming this issue is proper for appeal, there is no good reason to find the Bankruptcy Court erred in finding that the monies held in trust under the MBTFA were disbursed in October and November of 2001.

SO ORDERED.


Dated:  June 12, 2006                           s/Avern Cohn_____
                                                AVERN COHN
                                                UNITED STATES DISTRICT JUDGE




8

**05-73771 In Re: Brigantine Development**

## Proof of Service

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 12, 2006, by electronic and/or ordinary mail.

 s/Julie Owens
Case Manager
(313) 234-5160